# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| ROBERT J. ROBINSON, JR., and THOMAS J. DONOHUE, on behalf of themselves and all others similarly situated, | : : : : | NO. 3:05CV917 (MRK) |
| *Plaintiffs*, | : : | |
| v. | : : | |
| SHEET METAL WORKERS' NATIONAL PENSION FUND, PLAN A et al., | : : : | |
| *Defendants*. | : : | |

## <u>MEMORANDUM OF DECISION</u>

Plaintiffs Robert Robinson, Jr. and Thomas Donohue bring this action on behalf of themselves and other similarly situated individuals who retired from the sheet-metal trade on Industry-Related Disability ("IRD") benefits under the Sheet Metal Workers' National Pension Fund (the "Plan") between January 1, 1994, and December 31, 2004.  Plaintiffs sue the Plan,[1] the Plan's Trustees, and the Plan's administrator, claiming that Defendants improperly amended the Plan in 2004 to reduce IRD benefits for those earning more than $35,000 in a given year.  Plaintiffs sue under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461 (2006), alleging causes of action under ERISA's anti-cutback rule, as well as for breach of contract, promissory estoppel, and breach of fiduciary duties.  Am. Compl. [doc. # 31].  Defendants deny

---

[1] Prior to 2002, the Plan was divided into two sections – Plan A for construction employees and Plan B for production employees.  The Trustees merged Plans A and B in 2002.  There are no differences material for present purposes between the relevant portions of Plan A, Plan B, and the post-merger Plan.  While only Plan A is a named defendant in this suit, the plaintiff class includes beneficiaries of all three plans.  Throughout this Memorandum of Decision, all three Plans are referred to interchangeably as the "Plan."

Plaintiffs' allegations and also contend that Mr. Donohue's claims are moot.  Answer and Affirmative

Defenses [doc. # 47].

Plaintiffs moved to certify this case as a class action pursuant to Rule 23 of the *Federal Rules*

*of Civil Procedure*, Mot. for Class Certification [doc. # 41], and the parties agreed on a proposed

joint stipulation as to certification, which identified certain claims and issues as suitable for

resolution on a class basis.[2]  Resp. of Def. to Pls.' Mot. for Class Certification [doc. # 59].  After

concluding that class certification was appropriate, the Court certified a class of "[a]ll recipients of

an Industry-Related Disability Pension from the Plan who commenced receiving an Industry-Related

Disability Pension at any time during the period of January 1, 1994 to December 31, 2004."

Stipulated Order Certifying Class [doc. # 66] at 2-3.  The certification order encompassed all issues

common to class members that could be decided based solely on the stipulated record, which

comprised stipulated facts and over eight volumes and 5000 pages of documents.  The Court

excluded from certification:

> all issues related to Plaintiffs' estoppel claim a) that cannot be tried on the basis of
> the stipulated record alone or b) that cannot be decided as a matter of law at this

---

[2] In their Proposed Stipulated Order Certifying Class [doc. # 59], the parties proposed that
the Court certify a class including "[a]ll recipients of an Industry-Related Disability Pension from
the Plan who commenced receiving an Industry-Related Disability Pension at any time during the
period of January 1, 1994 to December 31, 2004."  *Id.* at 2-3.  The issues certified would include:

> all claims and issues raised in the First Amended Complaint that impact all class
> members, including the issue of whether, as Plaintiffs contend, based on the
> stipulated record alone, they satisfy the "extraordinary circumstances" requirement
> for the application of estoppel principles in this ERISA case or, whether, as
> Defendants contend, as a matter of law, it is impossible, based on the stipulated
> record, that any facts can be discovered that will allow Plaintiffs to establish
> "extraordinary circumstances" in this type of an ERISA case.

*Id.* at 1-2.

> juncture and all issues that pertain only to those individuals, like Plaintiff Donohue,
> who are or will be excluded from the $35,000 earnings limitation . . . .

*Id.* at 2. Any excluded issues would be dealt with in further proceedings. Neither side believes that facts outside the stipulated record are necessary to resolve this case. The Court agrees.

Both Plaintiffs and Defendants seek judgment based on the stipulated record. On April 18, 2006, the Court heard extensive oral argument on claims common to all class members. After considering the parties' submissions and arguments, the Court concludes that the amendments to the Plan do not violate ERISA, and therefore, the Court grants judgment for Defendants. Part I of this opinion represents the Court's findings of fact under Rule 52 of the *Federal Rules of Civil Procedure*; Part II represents the Court's conclusions of law.

**I.**

The following findings of fact are based upon the undisputed documentary record.

**A.     The 1994 Plan**

The Sheet Metal Workers' National Pension Fund is a multi-employer plan, established in 1966 and designed to qualify under Section 401(a) of the Internal Revenue Code ("the Code"), located at 26 U.S.C. § 401(a). In 1994, the Plan was amended by its Trustees to include an Industry-Related Disability ("IRD") Pension, in addition to its Normal Retirement Pension, Early Retirement Pension, and Disability Pension. The IRD Pension allows participants to receive benefits when they are "totally and permanently unable to return to employment in the Sheet Metal Industry" but are capable of employment in a different field. Ex. 35 at 3270.[3] The IRD Pension is available only to employees who have not attained "Normal Retirement Age," defined elsewhere in the Plan as age

---

[3] All exhibit citations refer to the exhibits that constitute the Joint Stip. Concerning Docs. [doc. # 76].

65 (subject to a years-of-service requirement), and who have earned sufficient pension and service credits.  Ex. 35 at 3232, 3270.[4]  Monthly benefits under the IRD Pension are determined by a formula based on the Early Retirement Pension benefits to which the employee would be entitled.  However, "in no event [is] the Industry-Related Disability Pension [allowed to] exceed the Normal Retirement Pension amount . . . that would be payable if the Participant had attained Normal Retirement Age on the day he became disabled."[5]  Ex. 35 at 3272.

------

[4] The Plan provides as follows:

(a) A Participant shall be entitled to retire on an Industry-Related Disability Pension if it is determined by the Trustees, in their sole and absolute discretion, on the basis of objective medical evidence that the Participant is totally and permanently unable to return to employment in the Sheet Metal Industry, but is capable of gainful pursuit or performing employment in another field, after January 1, 1994, and at a time when:
(1) he has not attained Normal Retirement Age;
(2) he has at least 10 years of Pension Credits;
(3) he has at least 12 months of Future Service Credit;
(4) he has worked in Covered Employment for at least 435 hours in the 24 month period that immediately preceded the date that the Trustees determined he became totally and permanently unable to return to employment in the Sheet Metal Industry; and
(5) after September 1, 1988, he has not at any time performed any employment in the Sheet Metal Industry that was not covered by a Collective Bargaining Agreement between the union and the employer.

Ex. 35 at 3270.

[5] The Plan states as follows:

The monthly amount of the Industry-Related Disability Pension shall be equal to the amount of the Early Retirement Pension to which the Participant would have been entitled . . . based on the years of Pension Credit which the Participant had earned up to the time of his disability. . . .   The Industry-Related Disability Pension shall be 10% greater than the amount of the Early Retirement Pension . . . except that in no event shall the Industry-Related Disability Pension exceed the Normal Retirement Pension amount . . . that would be payable if the Participant had attained Normal Retirement Age on the day he became disabled.  If a Participant qualifies for an

4

Eligibility for an IRD Pension "is determined by the Trustees, in their sole and absolute discretion," and beneficiaries may be required to submit to periodic medical examinations. The Plan provides that "[t]hese terms and any other terms as deemed necessary by the Trustees may be required as a prerequisite to the granting or continuance of an Industry-Related Disability Pension." Ex. 35 at 3271. Eligibility for an IRD Pension terminates when the beneficiary "is no longer totally and permanently unable to return to employment in the Sheet Metal Industry," but any beneficiary who loses eligibility for an IRD Pension on account of recovery may be entitled to a different type of pension, such as a Normal Retirement or Early Retirement Pension. *Id.* at 3272-73.

The Normal Retirement Pension is available to Plan participants reaching Normal Retirement Age, and is payable under one of two benefit categories, each with its own eligibility requirements and benefit schedules. *Id.* at 3258-66. The Early Retirement Pension is for participants age 55 and above who meet certain service and credit requirements. *Id.* at 3266-68. The Early Retirement Pension is paid in the amount of the Normal Retirement Pension, reduced by a percentage proportional to the difference in months between the beneficiary's age and Normal Retirement Age.[6]

_____

Industry-Related Disability Pension which is effective before age 55, the amount of the benefit shall be computed as though the Participant were age 55 on the Effective Date of Pension.

Ex. 35 at 3272.

[6] According to the Plan:

(1) The amount of the Early Retirement Pension shall be the amount of the Normal Retirement Pension . . . which the Participant would have been entitled to if he were then of Normal Retirement Age, but reduced by 1/2 of 1% for each month by which the participant is younger than age 65 on the Effective Date of his Early Retirement Pension.
(2) Effective for Early Retirement Pensions commencing on or after June 1, 1979 . . . the amount of the Early Retirement Pension shall be the amount of the Normal

*Id.* at 3268.  The Disability Pension is similar to the IRD Pension, except that eligible participants must be "permanently and totally disabled so that [they] cannot perform any significant employment in any field whatsoever as demonstrated by proof of approval for Social Security Disability."  Ex. 35 at 3268.  In addition to the four above-noted benefits, the Plan also provides retiree health benefits, which are described as "ancillary benefits" that "are subordinate to the retirement benefits provided by the Plan."  *Id.* at 3326.

Unless a beneficiary opts otherwise, all Plan pensions are paid as a "Husband-and-Wife Pension," which "provide[s] a lifetime pension for a married Participant plus a lifetime pension for his or her surviving spouse, starting after the death of the Participant."  *Id.* at 3274.  Plan beneficiaries are "entitled upon retirement to receive the monthly benefits provided for the remainder of his life, subject to the provisions of [the] Plan."  *Id.* at 3288; *see also id.* ("Except as otherwise provided in the Plan, pension payments to the Pensioner shall end with the payment for the calendar month in which the death of the Pensioner occurs.").

The Plan gives the Trustees sole authority to interpret and apply the Plan,[7] *id.* at 3287, and

---

Retirement Pension . . . which the Participant would have been entitled to if he were then of Normal Retirement Age, but reduced by 1/2 of 1% for each month by which the Participant is younger than age 62 (i.e., over age 55 but less than 62), plus 1/4 of 1% for each month between age 62 and 65.

Ex. 35 at 3268.

[7] The full provision is as follows:

The Trustees shall have the sole and absolute power, authority and discretion to determine:
(a) the standard of proof required in any case;
(b) the application and interpretation of this Plan;
(c) entitlement to or amount of a pension;
(d) the disability, extent of disability, or non-disability of Plan participants; and

6

provides that the Trustees may amend it "at any time . . . consistent with the provisions of the Trust Agreement," Ex. 35 at 3324.  Indeed, several provisions of the Plan confirm the Trustees' authority to amend the Plan.  *See, e.g.*, *id.* at 3227 ("Pursuant to their authority . . . the Trustees have amended the Plan from time to time."); *id.* at 3228 ("The term 'Plan' or 'Pension Plan' shall mean the provisions of the Rules and Regulations for the Sheet Metal Workers' National Pension Fund, as amended and restated effective January 1, 1994, together with any subsequent amendments duly adopted by the Trustees.").  However, the Plan expressly provides that "no amendment shall be effective if it is deemed to decrease the *accrued benefit* of any Participant."  *Id.* at 3324 (emphasis added).  The term "accrued benefit" is defined in the Plan as "the annual pension benefit provided under the Plan commencing at Normal Retirement Age," interpreted in accordance with Section 411(a)(7) of the Internal Revenue Code and Treasury Regulations promulgated thereunder.[8]  *Id.* at 3235.

The Plan also contains provisions regarding "Vested Status," which "is attained when a

---

(e) the crediting of Future or Past Service Credit.
(f) the crediting of Hours of Work and Years of Service.
The decisions of the Trustees with respect to any of the foregoing shall be final and binding.  Wherever in the Plan the Trustees are given discretionary powers, the Trustees shall exercise such powers in a uniform and non-discriminatory manner.

Ex. 35 at 3287-88.

[8] The full provision provides as follows:

The term "Acrued Benefit" shall mean generally the annual pension benefit provided under the Plan commencing at Normal Retirement Age.  Notwithstanding the foregoing, the term "Accrued Benefit" shall be interpreted in accordance with Section 411(a)(7) of the Code and the Treasury Regulations promulgated thereunder.

*Id.* at 3235.

Participant acquires a nonforfeitable right to his Normal Retirement Benefit or a nonforfeitable right to 100 percent of his Accrued Benefit." Ex. 35 at 3293. A participant's entitlement to his Normal Retirement Pension becomes nonforfeitable at Normal Retirement Age, subject to a years-of-service requirement.[9]

Finally, the Plan notes that "ERISA and the Code also provide certain limitations on any Plan amendments that may reduce or eliminate a Protected Benefit." *Id.* at 3295. Therefore, the Plan declares to be ineffective any amendment that decreases a participant's accrued benefit. *Id.* The Plan also describes those amendments that are treated as reducing accrued benefits:

> For purposes of this subsection . . . , a Plan amendment that has the effect of (1) eliminating or reducing an early retirement benefit or a retirement-type subsidy . . . with respect to benefits attributable to service before the amendment shall be treated as reducing Accrued Benefits. In the case of a retirement-type subsidy, the preceding sentence shall apply only with respect to a Participant who satisfies (either before or after the amendment) the pre-amendment conditions for the subsidy. In general, a retirement-type subsidy is a subsidy that continues after retirement, but does not include a qualified disability benefit (within the meaning of Section 411 (a) (9) of the Code), a medical benefit, a social security supplement, or a death benefit (including life insurance).

*Id.* at 3295. This provision of the Plan mirrors ERISA's anti-cutback rule and a Senate Report construing that rule, both of which are described below.

---

[9] Another provision in the Plan addressing vested status states as follows:

> While the Plan provides Early Retirement and Disability Pensions on the basis of requirements that may be met by some Participants who have not attained Vested Status, such eligibility rules represent provisions of the Plan above and beyond its vesting schedule.

Ex. 35 at 3294. The meaning and import of this provision is not entirely clear to the Court, but neither party argues that it affects the outcome of this case.

**B.**     **Plaintiffs Robinson and Donohue**

Robert Robinson, Jr. began working in the sheet metal trade in 1973.  Ex. 1 at 79.  Because of hip replacement surgery in 1999, he became totally and permanently disabled from working in the sheet-metal industry.  *Id.* at 86.  Through his union membership, Mr. Robinson was a participant in the Plan, and he applied for an IRD Pension in September 1999.  The application forms stated that an IRD beneficiary would "receive the monthly benefit payment . . . for [his] lifetime."  Ex. 28 at 3081.  The forms also provided that "Plan rules prohibit a pensioner receiving an Industry-Related Disability Pension to work in Disqualifying Employment [i.e. in the sheet metal or construction industry], *BUT allows* [sic] *any other employment without an earnings'* [sic] *limitation*."  *Id.* at 3082 (emphasis added); *see also id.* at 3089-90 (noting that a beneficiary "may work at other employment, except Disqualifying Employment, without any earnings limitation").  Mr. Robinson's application for an IRD Pension was granted, and he began to receive benefits.

Thomas Donohue began working in the sheet metal trade in about 1969.  In July 1998, he became disabled as a result of spinal stenosis and other health conditions, which prevented him from continuing to work in the sheet-metal industry.  Ex. 2 at 148-64.  Mr. Donohue was 55 years old at the time, and so he was offered the option of retiring on either an Early Retirement Pension or an Industry-Related Disability Pension.  Ex. 41 at 56-62.  Because the IRD Pension offered Mr. Donohue greater benefits than the Early Retirement Pension, and because – unlike the Early Retirement Pension – the IRD Pension offered the opportunity to later switch to a full Disability Pension, Mr. Donohue chose the IRD Pension.  Ex. 2 at 183; Ex. 35 at 3272-73.  Like Mr. Robinson and Mr. Donohue, 438 other class members became disabled from working in the sheet-metal industry and retired on IRD Pensions between January 1, 1994, and December 31, 2004.  Ex. 46 at

9

664-72.

**C.     Summary Plan Descriptions**

In accordance with their obligations under ERISA, Defendants have issued Summary Plan Descriptions ("SPDs") designed to summarize the Plan's terms.  *See* 29 U.S.C. § 1022(a) ("A summary plan description of any employee benefit plan shall be furnished to participants and beneficiaries . . . .").  These SPDs caution that they do not set forth all the Plan's terms.  *See, e.g.*, Ex. 23 at 2866 (1997 SPD) ("Please understand that no general explanation can adequately give you all of the details of the Plan, and that this general explanation does not change or expand or otherwise interpret the terms of the Plan.").  As is relevant here, the SPDs at several points discuss the Trustees' authority to amend the Plan.  For example, on its first page, the 1997 SPD notes that a beneficiary terminating his employment before January 1, 1994, would receive benefits "determined in accordance with the provisions of the Plan in effect on the date his employment terminated, except to the extent otherwise specifically provided under subsequent Plan amendments or restatements." *Id.*  The SPD further states: "The Trustees are empowered to amend the Plan at any time in accordance with the law and for such purposes as the Trustees deem appropriate.  The Trustees are further empowered to terminate the Plan."  *Id.* at 2900; *see also* Ex. 25 at 2952 (2002 SPD) ("IMPORTANT NOTICE: . . . The Trustees reserve the right to amend, modify or terminate the Plan at any time."); Ex. 25 at 3024 ("The Board of Trustees reserves the right to terminate, modify, suspend or amend the Pension Plan at any time, in whole or in part, under circumstances allowed by ERISA and the terms of the governing Trust Agreement.  The Board will make such changes to the Plan by Plan Amendment.").

**D.     The 2004 and 2005 Amendments**

After the 1994 version, the Plan went through several other versions without any material changes relevant here. *See, e.g.*, Exs. 3, 5-10, 18-19. In January 2004, Defendants amended the Plan to impose an earnings limitation on the IRD Pension, adding the following language to a section entitled "Restriction on Employment by Disability Pensioner":

> Effective January 1, 2005, an Industry-Related Disability Pensioner will be subject to the following employment earnings limitation: the highest hourly base rate in his last Local Union for the previous Calendar Year multiplied by 1800 hours.

Ex. 11 at 1258. This provision also appeared in a version of the Plan reissued in March. Ex. 12 at 1424. However, the change was not reported in the "Summary of Material Modifications" that Plan participants were sent in July, 2004. Ex. 26 at 3067-69.

In November 2004, Defendants again amended the Plan. What had previously been described as an "Industry-Related Disability Pension" was now described as an "Industry-Related Disability Benefit." Ex. 13 at 1644-50. Like the January and March versions, the November version also included an earnings limitation on the receipt of IRD benefits:

> Effective for Plan years beginning on or after January 1, 2005, an Industry-Related Disability Benefits recipient who earns $35,000 or more in any calendar year, in any employment whatsoever, will be deemed no longer disabled for any purpose under the Plan and his benefit shall terminate.

Ex. 13 at 1648. Defendants argue, and the Court agrees, that the earnings limitation represents a change from the 1994 Plan in terms of the definition of who is disabled for purposes of eligibility for an IRD benefit. Under the Amended Plan, a recipient of an IRD benefit who earns over $35,000 will lose his eligibility to receive IRD benefits, though "he will be permitted to elect any type of pension for which he qualifies . . . and his pension will be unaffected by the prior receipt of any

11

Disability Benefits that he was eligible to receive." Ex. 32 at 3121.

The November 2004 amendment applied to all pensions granted prior to January 1, 2005. Recipients of IRD benefits were notified of the change by letter on December 16, 2004. Ex. 27 at 3076. In January 2005, Mr. Robinson filed an administrative appeal protesting the November 2004 amendment and its application to his benefits. Ex. 1 at 3. Following a denial of his appeal by the Appeals Committee of the Sheet Metal Workers' National Pension Fund in March, Ex. 1 at 19-20, Mr. Robinson filed this action in June. He amended the Complaint in September to add Mr. Donohue as a plaintiff. Proposed First Am. Compl. [doc. #26]. The Plan was amended again in 2005 to restrict the earnings limitation only to those under the age of 55. Ex. 17 at 2327. As a result, Mr. Donohue is unaffected by the earnings limitation, though Mr. Robinson is.

## II.

This case requires the Court to determine whether Defendants violated ERISA by limiting IRD benefits to those recipients who earn less than $35,000 in a given year. The Court notes that its decision is limited to recipients who are under the age of 55, since the 2005 amendment to the Plan exempted workers aged 55 and above from the IRD earnings limitation.

"[A] district court reviews a plan administrator's denial of benefits under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Gibbs v. CIGNA Corp.*, 440 F.3d 571, 575 (2d Cir. 2006) (internal quotation marks omitted). "Where the plan reserves discretionary authority for the administrator, . . . denials are subject to the more deferential arbitrary and capricious standard, and may be overturned only if the decision is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Id.* (internal quotation marks omitted). Here, the Plan

makes crystal clear that the Trustees retain authority to interpret and apply the Plan. *See, e.g.*, Ex. 35 at 3287 ("The Trustees shall have the sole and absolute power, authority and discretion to determine . . . the application and interpretation of this Plan . . . ."). Thus, to the extent that the parties dispute the meaning or proper application of Plan provisions, an arbitrary and capricious standard of review applies. However, on questions of statutory interpretation, a court "owe[s] the plan administrators no deference." *Wilkins v. Mason Tenders Dist. Council Pension Fund*, 445 F.3d 572, 581 (2d Cir. 2006) ("The interpretation of ERISA, a federal statute, is a question of law subject to *de novo* review." (internal quotation marks omitted)). Therefore, insofar as a disputed issue turns on the proper interpretation of statutes or regulations, the Court applies a *de novo* standard of review.[10]

Having set forth the relevant standard of review, the Court next addresses each of Plaintiffs' claims in turn.

**A.    ERISA's Anti-Cutback Rule**

ERISA contains a so-called "anti-cutback" rule that "prohibit[s] amendments to pension plans

---

[10] To be sure, whether a dispute concerns issues of plan interpretation or issues of statutory interpretation is not always clear. Furthermore, the Second Circuit has only added to the difficulty of the task by repeatedly declining in ERISA cases to declare the applicable standard of review. *See, e.g.*, *Frommert v. Conkright*, 433 F.3d 254, 266 n.11 (2d Cir. 2006) (noting that "[i]t is not settled whether a *de novo* or arbitrary and capricious standard of review applies" but declining to decide); *Burke v. Kodak Ret. Income Plan*, 336 F.3d 103, 110 (2d Cir. 2003) (noting that "the standard of review to be applied when the question is whether the SPD complies with ERISA's disclosure requirements is not so clear" but declining to decide); *Layaou v. Xerox Corp.*, 238 F.3d 205, 212 (2d Cir. 2001) ("express[ing] no view on whether the deferential standard of review for a plan administrator's interpretation of a plan . . . is applicable to a plan administrator's interpretation of an SPD, where it has been determined that the SPD violates the disclosure requirements of 29 U.S.C. § 1022"); *Moriarity v. United Tech. Corp. Represented Employees Ret. Plan*, 158 F.3d 157, 158 (2d Cir.1998) (per curiam) (declining to resolve the issue of what standard of review applies to a plan administrator's interpretation of an SPD).

which diminish the accrued benefits of the participants." *Perreca v. Gluck*, 295 F.3d 215, 228 (2d

Cir. 2002).  The rule provides as follows:

> (1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 302(c)(8) or 4281 [29 USCS § 1082(c)(8) or 1441].
> (2) For purposes of paragraph (1), a plan amendment which has the effect of--
>> (A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations), . . .
>
> with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits.

29 U.S.C. § 1054(g) (2006).  Plaintiffs first argue that the addition of the IRD earnings limitation

in November 2004 violated ERISA's anti-cutback rule.

Defendants do not deny that the earnings limitation decreased the benefits available under

the IRD plan.  *See Cent. Laborer's Pension Fund v. Heinz*, 541 U.S. 739, 744-45 (2004) (holding

that a plan amendment imposing a new condition on the continued receipt of a benefit triggers anti-

cutback protection).  Instead, they argue that the IRD benefit is not the type of employment benefit

to which the anti-cutback provisions of Section 1054(g) applies. The Court agrees.

### 1.      Pension Plan v. Welfare Benefit Plan

Under ERISA, an employee benefit plan may be one of two general types – an "employee

pension benefit plan," also known as a "pension plan;" or an "employee welfare benefit plan," also

known as a "welfare benefit plan."  29 U.S.C. § 1002(3) (2006).  Section 1002 provides that a plan

is a pension plan "to the extent that [it] . . . provide[s] retirement income to employees, or . . . results

in a deferral of income by employees for periods extending to the termination of covered

employment or beyond." 29 U.S.C. § 1002(2)(A).  A plan is a welfare benefit plan "to the extent that

such plan . . . was established or is maintained for the purpose of providing for its participants or

their beneficiaries . . . medical, surgical, or hospital care or benefits, or benefits in the event of

sickness, accident, disability, death or unemployment" (as well as several other types of benefits that

are not relevant for present purposes). 29 U.S.C. § 1002(1). The distinction between a pension plan

and a welfare benefit plan is critical to this case because, while the anti-cutback rule protects pension

plans from diminution in benefits, it does not protect welfare plans. *See* 29 U.S.C. § 1051(1) (2006)

(providing that the portion of ERISA that includes Section 1054(g)'s anti-cutback rule does not apply

to "an employee welfare benefit plan").

In interpreting Section 1002(1), which defines a "welfare benefit plan," the Second Circuit

has held that the anti-cutback rule does not apply to any plan, or *portion* of a plan, that provides

disability benefits. *Rombach v. Nestle USA, Inc.*, 211 F.3d 190, 193 (2d Cir. 2000). Thus, in

*Rombach*, the court held as follows:

> The wording of Section 1002(1) seems to confirm defendants' position that the . . .
> Plan, while not "solely" a disability plan, is an "employee welfare benefit plan" *to the*
> *extent that* it provides welfare-type benefits. In our view, the words "to the extent
> that" rather than "solely" clearly indicate that Congress intended to allow any plan or
> part of a plan having disability provisions to be considered an "employee welfare
> benefit plan," and thus be exempt from [anti-cutback protection].

*Id.* at 193 (emphasis in original) (quoting *McBarron v. S & T Indus., Inc.*, 771 F.2d 94, 98 (6th Cir.

1985)); *see also Gibbs v. CIGNA Corp.*, 440 F.3d 571, 576 (2d Cir. 2006) ("Long-term disability

plans fall within ERISA's definition of an 'employee welfare benefit plan.'"). Indeed, in *Rombach*,

the Second Circuit held that a disability benefit was not a pension benefit, despite the fact that the

plan itself described the disability benefit as a "pension" and the disability benefit was part of a

master plan that also included a variety of retirement pensions, such as early retirement pensions and

normal retirement pensions. *Rombach*, 211 F.3d at 194 ("[I]t does not matter that Nestle called the

disability retirement pension portion of its plan a 'pension benefit' and made it part of its master 'pension plan.'").  To the *Rombach* court, a disability benefit is a welfare benefit because "it was a benefit triggered by disability."  *Id.*  ("[U]nder the plain language of the statute, 'to the extent' that [the] Pension Plan provides benefits that are triggered by disability, that portion of the plan is a welfare plan under § 1002(1)."); *see McBarron*, 771 F.2d at 97 (quoted with approval in *Rombach*) ("Since the plan in question provides employees with 'benefits in the event of . . . disability,' it is clearly an 'employee welfare benefit plan' as contemplated by ERISA.").  And because the disability benefit offered in *Rombach* was a welfare benefit plan, it was not subject to ERISA's anti-cutback rule.

Like the benefit at issue in *Rombach*, the IRD benefit in this case is a disability benefit, because it is triggered by disability and terminates when the beneficiary is no longer disabled.  In the words of Section 1002(1), the IRD  provides "benefits in the event of . . . disability."  As a result, under the directly applicable Second Circuit precedent of *Rombach*, the IRD plan is a welfare benefit plan and not a pension plan, and as a consequence, the IRD is not subject to ERISA's anti-cutback rule.  *See Neely v. Pension Trust Fund of the Pension, Hospitalization & Benefit Plan of the Elec. Indus.*, No. 00 CV 2013, 2003 WL 21143087, at *5 (E.D.N.Y. Jan. 16, 2003) ("Plaintiff's disability retirement pension is an employee welfare benefit plan and therefore, Defendants were free to amend the plan at any time.").

Plaintiffs offer several arguments in response.  First and foremost, Plaintiffs argue that *Rombach* was wrongly decided.  Pls.' Corrected Reply Trial Mem.[doc. # 84] at 16 ("*Rombach*'s holding . . . is incorrect . . . .").  Plaintiffs contend that *Rombach* was "incorrectly decided to the extent that [it] hold[s] that a disability pension cannot be a pension protected under [the anti-cutback

rule] because it must be classified as a welfare benefit." Pls.' Trial Mem.[doc. # 71] at 35. Plaintiffs stress that some disability benefits, such as the IRD benefit, involve the sort of long-term payment programs that typify pensions, and therefore *Rombach* erroneously concluded that disability plans may not be pension plans. However, the IRD benefit in this case is virtually indistinguishable from the disability benefit involved in *Rombach*. Under these circumstances, this Court is not at liberty to ignore *Rombach*'s clear holding. In short, whatever the substantive merit of Plaintiffs' criticisms of *Rombach*, this Court is not the proper venue in which to press them.

Second, Plaintiffs note that before the 2004 Amendment, the Plan repeatedly referred to the IRD benefit as a "Pension." *See, e.g.*, Ex. 35 at 3258 (describing the IRD benefit under the "Pension Eligibility and Amounts" heading); *id.* at 3270 (describing the IRD benefit as a "Pension"); *id.* (describing eligibility criteria). And on the "Annual Return/Report of Employee Benefit Plan" forms Defendants submitted to the IRS in 2000, 2001, 2002, and 2004, Defendants did not differentiate between IRD benefit funds and other pension funds, grouping all under the heading of "Pension benefits" rather than "Welfare benefits." Ex. 39 at 3556; Ex. 42 at 81; Ex. 43 at 220; Ex. 44 at 590.

As noted above, however, the court in *Rombach* rejected the proposition that a disability plan would become a pension plan merely because the plan administrator chose to describe it as such. *Rombach*, 211 F.3d at 194. In short, it is not the label, but rather the substance that controls. Therefore, whatever it was called, the IRD benefit's "meaning and function remained clear; it was a benefit triggered by disability." *Id.*

Third, Plaintiffs argue that other cases have recognized that disability benefits may be properly classified as pension benefits rather than as welfare benefits. Plaintiffs cite a litany of cases in which courts generally described or called disability plans "disability pensions." *See, e.g.*, *Eichel*

17

*v. N.Y. Cent. R.R. Co.*, 375 U.S. 253, 254-55 (1963) (holding that evidence of payment under a "disability pension" was not admissible on the issue of whether plaintiff was malingering); *Larsen v. NMU Pension Trust of the NMU Pension & Welfare Plan*, 902 F.2d 1069, 1073 (2d Cir. 1990) (reversing summary judgment on the issue of whether defendant's material misrepresentation caused employee to forgo a "disability pension"). Indeed, Plaintiffs even cite a case in which the same IRD benefit at issue in this case was described by a court as a "pension." *See Gilliam v. Trustees of Sheet Metal Workers' Nat'l Pension Fund, Plan A*, No. 03-CV-7421, 2005 WL 1026330, at *4 (S.D.N.Y. May 3, 2005) ("[T]he Industry-Related Disability Pension pays a reduced pension when an eligible participant is unable to work in the sheet-metal industry, but can hold other types of employment.").

The Court declines Plaintiffs' invitation to read these cases as support for the proposition Plaintiffs advance. None of the cited cases even discusses the issue that *Rombach* squarely resolved: whether a disability plan qualifies for anti-cutback protection under ERISA. The casual description of disability benefits as "pensions" in the cases cited hardly constitutes a basis for ignoring a directly on-point Second Circuit precedent – particularly since all of the decisions cited by Plaintiffs are either district court cases, decisions from other jurisdictions, or decisions that pre-date *Rombach*.

Finally, Plaintiffs cite to Treasury Department regulations that suggest disability benefits may qualify as protected benefits.[11] In the "Questions and Answers" section, the Treasury

---

[11] The Internal Revenue Code contains an anti-cutback provision that closely mirrors the language of Section 1054(g). *See* 26 U.S.C. § 411(d)(6) ("A plan shall be treated as not satisfying the requirements of this section if the accrued benefit of a participant is decreased by an amendment of the plan . . . ."). Because of the close fit between ERISA's anti-cutback rule and the Code's anti-cutback rule, regulations relating to the latter are often considered by courts when analyzing the former. *See Cent. Laborers' Pension Fund*, 541 U.S. at 747 ("Although the pertinent regulations refer only to the Internal Revenue Code version of the anti-cutback rule, they apply with equal force to [29 U.S.C. § 1054(g)]."). Therefore, in analyzing ERISA's anti-cutback rule, the Court will at times refer to Code regulations.

regulations note that some changes to benefits protected by the Code's anti-cutback rule are allowed:

> (b) Exception for administrative discretion.  A plan may permit limited discretion with respect to the ministerial or mechanical administration of the plan, including the application of objective plan criteria specifically set forth in the plan. Such plan provisions do not violate the requirements of section 411(d)(6) or the definitely determinable requirement of section 401(a), including section 401(a)(25). For example, these requirements are not violated by the following provisions that permit limited administrative discretion:
>
> . . . .
>
> (2) Employer authority to determine whether objective criteria specified in the plan (e.g., objective criteria designed to identify those employees with a heavy and immediate financial need or *objective criteria designed to determine whether an employee has a permanent and total disability*) have been satisfied; . . . .

Treas. Reg. § 1.411(d)-4, Q&A (4) (2005) (emphasis added).  Plaintiffs point to the italicized language quoted above and argue that unless disability benefits can sometimes qualify as protected benefits, there would be no reason to exempt from anti-cutback protection an employer's evaluation of whether disability criteria had been satisfied.

The language of the regulation cited by Plaintiffs does not by itself give the Court cause to ignore *Rombach*.  If the Court is to disregard directly applicable Second Circuit precedent, something more than an ambiguous hint from a lone phrase in a Treasury Regulation will be required. Therefore, the Court reaffirms its conclusion that the IRD plan is a welfare benefit plan, and that it is not protected by ERISA's anti-cutback rule.

### 2.    Accrued Benefits v. Ancillary Benefits

Even if the Court were to ignore *Rombach* and find the IRD benefit to be a pension benefit, that would not necessarily result in the IRD benefit receiving protection from the anti-cutback rule. For Section 1054(g) protects only an "accrued benefit" and two types of benefits that are treated like accrued benefits – "early retirement benefits" and "retirement-type subsidies." *See Arndt v. Security*

*Bank S.S.B. Employees' Pension Plan*, 182 F.3d 538, 540-41 (7th Cir. 1999).  Moreover, the anti-cutback rule does not protect "ancillary benefits."  *See* 26 C.F.R. § 1.411(d)-3(b)(3)(i) ("[The Code's anti-cutback rule] does not provide protection for benefits that are ancillary benefits, other rights and features, or any other benefits that are not described in [the anti-cutback rule].").  Defendants argue that the IRD benefit is not an accrued benefit, early retirement benefit, or retirement-type subsidy.  The Court agrees, and moreover concludes that the IRD benefit is an ancillary benefit.  Therefore, the benefit is not subject to the protection of ERISA's anti-cutback provision.

### a.    Accrued Benefits

Accrued benefits typically are "expressed in the form of an annual benefit commencing at normal retirement age."  29 U.S.C. § 1002(23)(A); *see McDonald v. Pension Plan of NYSA-ILA Pension Trust Fund*, 320 F.3d 151, 156 (2d Cir. 2003) ("'Accrued' benefits refer to those normal retirement benefits that an employee has earned at any given time during the course of employment.").  However, the definition of accrued benefit also includes benefits "as provided in section 1054(c)(3)," which in turn provides as follows:

> For purposes of this section, in the case of any defined benefit plan, if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age, or if the accrued benefit derived from contributions made by an employee is to be determined with respect to a benefit other than an annual benefit in the form of a single life annuity (without ancillary benefits) commencing at normal retirement age, the employee's accrued benefit, or the accrued benefits derived from contributions made by an employee, as the case may be, shall be the actuarial equivalent of such benefit or amount determined under paragraph (1) or (2).

29 U.S.C. § 1054(c)(3).

Plaintiffs seize on the phrase "accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age" (which appears in the second and third lines

20

quoted above) as an indication that the IRD benefit is an accrued benefit because it is an amount other than the annual benefit commencing at normal retirement age.  However, Section 1054(c)(3) does not indicate that any benefit may qualify as an accrued benefit, whether related to retirement or not, so long as its amount differs from what the employee would receive at normal retirement age. Indeed, the provision is not meant to help identify what is or is not an accrued benefit.  Instead, the language of Section 1054(c) applies to benefits already identified as accrued: it is intended merely to specify the *value* that an accrued benefit must have if it is paid in a manner "other than an annual benefit commencing at normal retirement age."  *See Esden v. Bank of Boston*, 229 F.3d 154, 164 (2d Cir. 2000) (explaining that Section 1054(c)(3) embodies a "rule that regardless of any option as to timing or form of distribution, a vested participant in a defined benefit plan must receive a benefit that is the actuarial equivalent of her normal retirement benefit (that is, the accrued benefit expressed as an annuity beginning at normal retirement age)"); *Spacek v. Maritime Ass'n*, 134 F.3d 283, 290 (5th Cir. 1998) (noting that Section 1054(c)(3) expresses "the general rule that, where an employee's pension benefit commences at a time other than normal retirement age, the accrued portion of such a benefit is the actuarial equivalent of the retirement benefit available at normal retirement age"), *abrogated on other grounds by Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739 (2004).  There is no indication in the language or legislative history of ERISA that a disability benefit might qualify as an accrued benefit under Section 1054(c)(3); Indeed, the regulations flatly state that "[i]n general, the term 'accrued benefits' refers only to pension or retirement benefits."  *See* 26 C.F.R. § 1.411(a)-7(a)(1)(ii). Plaintiffs cite no authority to the contrary.  Therefore, the Court concludes that the IRD benefit is not an accrued benefit.

### b.   Early Retirement Benefit

"The term early retirement benefit means the right, under the terms of a plan, to commence distribution of a retirement-type benefit at a particular date after severance from employment with the employer and before normal retirement age.  Different early retirement benefits result from differences in terms relating to timing."  26 C.F.R. § 1.411(d)-3(g)(6)(i).  Plaintiffs make a perfunctory attempt to argue that the IRD benefit is an early retirement benefit because IRD benefit payments commence "at a particular date after severance from employment with the employer and before normal retirement age" – namely, the IRD benefit commences "no sooner than the seventh month of . . . the total and permanent inability to return to employment in the Sheet Metal Industry. . . ."  Ex. 35 at 3271.

Plaintiffs have again attempted to shoe-horn the IRD benefit into an ill-fitting heading.  Cases discussing Section 1054(g) describe "early retirement benefits" in precisely the terms that the phrase naturally evokes.  Just as retirement plans typically allow for retirement at the "normal retirement age" – often, age 65 – early retirement plans allow for retirement at an age earlier than the normal retirement age – often, age 55.  *See, e.g.*, *Bellas v. CBS*, 221 F.3d 517, 525 (3d Cir. 2000) ("[E]arly retirements often commence at age 55 and possibly require the fulfilment of a minimum period of service.").  Thus, in *Ross v. Pension Plan for Hourly Employees of SKF Indus., Inc.*, 847 F.2d 329 (6th Cir. 1988), the Sixth Circuit explained that under the "widely understood meaning of the term[]," "[e]arly retirement benefits are generally benefits that become available upon retirement at or after a specified age which is below the normal retirement age, and/or upon completion of a specified period of service."  *Id.* at 333.

Here, the Plan includes an Early Retirement Pension, which (subject to a years-of-service requirement) commences at age 55 rather than the normal retirement age of 65.  Unlike the Early

Retirement Pension, the IRD benefit is not triggered by attainment of a particular age or period of service, but rather by an industry-related disability.   Once again, Plaintiffs cite no authority to support their assertion that a benefit triggered by a disability may be properly classified as an early retirement benefit.   The Court rejects Plaintiffs' unsupported argument and concludes that the IRD benefit is not an early retirement benefit.

### c.      Retirement-Type Subsidy

The definition of "retirement-type subsidy" is enmeshed with the definition of "retirement-type benefit."   Treasury regulations provide as follows:

> (iii) Retirement-type benefit.  The term retirement-type benefit means --
>> (A) The payment of a distribution alternative with respect to an accrued benefit; or
>> (B) The payment of any other benefit under a defined benefit plan (including a QSUPP as defined in § 1.401(a)(4)-(12) that is permitted to be in a qualified pension plan, continues after retirement, and is not an ancillary benefit.
>
> (iv) Retirement-type subsidy.  The term retirement-type subsidy means the excess, if any, of the actuarial present value of a retirement-type benefit over the actuarial present value of the accrued benefit commencing at normal retirement age or at actual commencement date, if later, with both such actuarial present values determined as of the date the retirement-type benefit commences. Examples of retirement-type subsidies include a subsidized early retirement benefit and a subsidized qualified joint and survivor annuity.
>
> (v) Subsidized early retirement benefit or early retirement subsidy.  The terms subsidized early retirement benefit or early retirement subsidy mean the right, under the terms of a plan, to commence distribution of a retirement-type benefit at a particular date after severance from employment with the employer and before normal retirement age where the actuarial present value of the optional forms of benefit available to the participant under the plan at that annuity starting date exceeds the actuarial present value of the accrued benefit commencing at normal retirement age (with such actuarial present values determined as of the annuity starting date). Thus, an early retirement subsidy is an early retirement benefit that provides a retirement-type subsidy.

26 C.F.R. § 1.411(d)-3(g)(6).  As one court has explained, "a retirement benefit is a retirement-type subsidy if the sum of the monthly payments for the participants's life exceeds what the participant

would have received as normal retirement benefits." *Richardson v. Pension Plan of Bethlehem Steel Corp. & Subsidiary Cos.*, 67 F.3d 1462, 1468 (9th Cir. 1995) (citing cases), *opinion withdrawn by* 91 F.3d 1312 (9th Cir. 1996), *and different result reached on other grounds by* 112 F.3d 982 (9th Cir. 1997).

Congress intended that the term "retirement-type subsidy" would be further defined by regulations, but as of yet, no such regulations have been promulgated.  However, an oft-quoted Senate Report explained the term as follows:

> The bill provides that the term "retirement-type subsidy" is to be defined by Treasury regulations.  The committee intends that under these regulations, a subsidy that continues after retirement is generally to be considered a retirement-type subsidy. *The committee expects, however, that a qualified disability benefit*, a medical benefit, a social security supplement, a death benefit (including life insurance), or a plant shutdown benefit (that does not continue after retirement age) *will not be considered a retirement-type subsidy*.

S. Rep. No. 98-575, at 30 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 2547, 2576 (emphasis added) [hereinafter Senate Report].  A "qualified disability benefit" is defined in the regulations as "a disability benefit provided by a plan which does not exceed the benefit which would be provided for the participant if he separated from the service at normal retirement age."  26 U.S.C. § 411(a)(9) (referenced in 26 C.F.R. § 1.411(d)-3(g)(2)(ii)).

Here, the Plan specifically states that "in no event shall the Industry-Related Disability Pension exceed the Normal Retirement Pension amount . . . that would be payable if the Participant had attained Normal Retirement Age on the day he became disabled."  Ex. 35 at 3272.  Because the IRD benefit is a disability benefit that, by definition, cannot exceed the benefits payable upon normal retirement, it is a qualified disability benefit within the meaning of 26 U.S.C. § 411(a)(9) and thus precisely the sort of benefit that ERISA's legislative history indicates does not qualify as a

24

"retirement-type subsidy."

The Fifth Circuit's decision in *Williams v. Plumbers & Steamfitters Local 60 Pension Plan*, 48 F.3d 923 (5th Cir. 1995) is illustrative. There, the court rejected plaintiff's claim that a plan's disability benefit was a retirement-type subsidy even though disability benefits were "payable for life and calculated in a manner similar to retirement subsidies in general." *Id.* at 925. Citing the Senate Report, the Fifth Circuit nevertheless concluded that because the benefit was a "qualified disability benefit," it could not be a retirement-type subsidy. *Id.* ("Although the regulations do not define a 'retirement-type subsidy,' the legislative history makes clear that the term does not include disability benefits . . . ."); *see also Arndt*, 182 F.3d at 541 ("What we need to decide is whether under ERISA [plaintiff's] benefits are accrued; are a retirement subsidy; or, on the other hand, whether they are disability benefits."). The holding in *Williams* is equally applicable here.

In an attempt to avoid the inevitable, Plaintiffs seek to analogize the IRD benefit to plant shutdown benefits, which are payable in the event that a plant in which the beneficiary works is forced to close. Plaintiffs note that some courts have concluded that plant shutdown benefits are retirement-type subsidies when the benefits continue beyond normal retirement age and exceed the amount payable under an actuarially reduced normal retirement benefit. *See, e.g.*, *Bellas*, 221 F.3d at 532 ("[U]npredictable contingent event benefits that provide a benefit greater than the actuarially reduced normal retirement benefit are retirement-type subsidies . . . if the benefit continues beyond normal retirement age."); *Richardson*, 67 F.3d at 1468-69 (holding that a shutdown benefit was a retirement-type subsidy where it continued past normal retirement age and "exceed[ed] what . . . employees would have received as normal retirement benefits"); *but see, e.g.*, *Ross*, 847 F.2d at 333-34 (holding that a plant shutdown benefit was not a retirement-type subsidy). Plaintiffs argue that,

like the plant shutdown benefits in *Bellas* and *Richardson*, the IRD benefit is triggered by a contingent event (namely, disability), it continues after normal retirement age, and it provides lifetime benefits based on factors such as age and years of service.

Plaintiffs' effort to compare the IRD benefit to plant shutdown benefits is unavailing for two reasons. First, *Bellas* and *Richardson* involved shutdown benefits that exceeded the amount payable under the normal retirement benefit. As explained above, the IRD benefit may not exceed the amount that would be payable under the Normal Retirement Pension if the beneficiary became disabled on the day he reached normal retirement age.[12] Second, the Senate Report discussed above specifically excludes from the definition of retirement-type subsidy only those plant shutdown benefits "that do[] not continue after retirement age." *See Bellas*, 221 F.3d at 532 ("[T]he Senate Report clearly suggests that plant shutdown benefits that continue after normal retirement age are retirement-type subsidies . . . ."); *Richardson*, 67 F.3d at 1468 ("We read the Senate Report to mean that shutdown benefits that do continue after retirement age are a retirement-type subsidy."). By contrast, the same report provides without qualification that disability benefits are not to be counted as retirement-type subsidies. The Court has no basis to assume that Congress, having expressly distinguished between disability benefits and plant shutdown benefits, intended that they be treated identically. Even if some shutdown benefits may qualify as retirement-type subsidies (a proposition that this Court need not, and does not, decide), disability benefits do not.

In sum, the Court concludes that the IRD benefit is not an accrued benefit, an early retirement

_____

[12] Plaintiffs argue that the present value of Plaintiff Robinson's IRD benefit exceeds what he would be due under an Early Retirement Pension beginning at age 55. Pls.' Trial Mem. 39 [doc. # 71]. As explained above, the proper comparison is between the IRD benefit and the "benefit which would be provided for the participant if he separated from the service at normal retirement age." 26 U.S.C. § 411(a)(9). The Plan explicitly forbids the former to exceed the latter. Ex. 35 at 3272.

benefit, or a retirement-type subsidy.  Therefore, the anti-cutback protections of Section 1054(g) do

not apply to the IRD benefit.

### d.    Ancillary Benefit

There is yet another reason why the IRD benefit is not subject to the anti-cutback provision

of ERISA, and that is because the IRD benefit is an "ancillary benefit."   Under 26 C.F.R.

§ 1.411(d)-3(g)(2), the term ancillary benefit means:

> (ii) A benefit payable under a defined benefit plan in the event of disability
> (to the extent that the benefit exceeds the benefit otherwise payable), but only
> if the total benefit payable in the event of disability does not exceed the
> maximum qualified disability benefit, as defined in section 411(a)(9) . . . .

*See also* 26 C.F.R. § 1.411(a)-7(1)(ii) (noting that "accrued benefits do not include ancillary benefits

not directly related to retirement benefits such as . . . disability benefits not in excess of the qualified

disability benefit"); 26 C.F.R. § 1.411(a)-7(c)(3) (referring to "ancillary benefits not directly related

to retirement benefits such as . . . disability benefits not in excess of the qualified disability benefit").

The regulations' categorization of disability benefits as ancillary benefits is consistent with a House

Conference Report on ERISA, which explained that

> [u]nder the conference substitute, the term 'accrued benefit' refers to pension or
> retirement benefits. *The term does not apply to ancillary benefits, such as* payment
> of medical expenses (or insurance premiums for such expenses), or *disability benefits*
> *which do not exceed the normal retirement benefit payable at age 65 to an employee*
> *with comparable service under the plan*, or to life insurance benefits payable as a
> lump sum.

H.R. Conf. Rep. No. 93-1280 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 5038, 5054 (emphasis

added) [hereinafter House Report].

Thus, under both the regulations and the House Report, a disability benefit is an ancillary

benefit if it does not exceed the amount payable as a normal retirement benefit.  As explained above,

27

this definition precisely describes the IRD benefit, which by its terms cannot exceed the Normal Retirement Pension amount payable if the beneficiary attained Normal Retirement Age on the day he became disabled.  Consequently, the IRD benefit "does not exceed the maximum qualified disability benefit, as defined in section 411(a)(9)." *See* 26 C.F.R. § 1.411(d)-3(g)(2).  It is, therefore, an ancillary benefit, and as such, it is not subject to the anti-cutback provisions of Section 1056(g). 26 C.F.R. § 1.411(d)-3(b)(3)(i).

Plaintiffs nevertheless argue that the IRD benefit is not an ancillary benefit because Plan documents describe it in the same terms as other pensions.  For instance, the pre-amendment Plan refers to the IRD benefit as an "IRD Pension," describes the IRD benefit in the "Pension" section of the Plan along with the Normal Retirement Pension and Early Retirement Pension, and uses years-of-service and rate-of-contribution criteria to determine a beneficiary's eligibility for the IRD benefit, just as the other pensions do.  Ex. 35 at 3258-73 ("Pension Eligibility and Amounts" heading under which the IRD benefit is described); *id.* at 3270 (describing the IRD benefit as a "Pension"); *id.* (describing eligibility criteria).  Moreover, Plaintiffs argue that the IRD benefit is not an ancillary benefit because it is not "subordinate" to the pension benefits offered by the Plan.  Instead, like the other pension benefits, the IRD benefit continues past retirement age and is paid in the form of a lifetime annuity.  By contrast, the Plan specifically states that health benefits are ancillary benefits that are "subordinate to the retirement benefits provided by the Plan."  Ex. 35 at 3326 ("The retiree health benefits the Plan may provide, in whole or in part, are ancillary benefits and do not in any way constitute a part of a Pensioner's or Beneficiary's Accrued Benefit.").  Thus, Plaintiffs argue, the IRD benefit is a pension and not an ancillary benefit.

The portions of the pre-amendment Plan cited by Plaintiffs suggest that Defendants

themselves may have believed that the IRD benefit was a pension benefit and not an ancillary

benefit.  But whatever Defendants' beliefs may have been does not change the fact that the IRD

benefit does not qualify in substance as an ancillary benefit under the regulations and the House

Report.  *See Rombach*, 211 F.3d at 193 (finding unpersuasive plaintiff's argument that a disability

benefit was a pension "because [defendant] called it a 'pension benefit' and made it a part of its

master pension plan that included a number of different types of pensions"); *id.* at 194 ("In our view,

it does not matter that [defendant] called the disability retirement pension portion of its plan a

'pension benefit' and made it part of its master 'pension plan.'  Its meaning and function remained

clear; it was a benefit triggered by disability.").  Nor is the IRD benefit any less an ancillary benefit

because it is substantial in amount and continues past normal retirement age.  The regulations and

House Report make clear that a disability benefit is an ancillary benefit so long as it does not exceed

the amount payable at normal retirement, an amount that can be quite substantial and may last a very

long time.  Indeed, some disability benefits do not even *begin* until normal retirement age; yet, courts

still deem such benefits to be ancillary benefits if they are triggered by disability.[13]  *See Arndt*, 182

---

[13] In arguing that the IRD benefit is not an ancillary benefit, Plaintiffs cite *Heise v. Genuine Parts Co.*, 900 F. Supp. 1137 (D. Minn. 1995).  In *Heise*, the court upheld as reasonable a plan administrator's determination that the plan's disability benefit was a retirement benefit rather than an ancillary benefit.  *Id.* at 1145-48.  For a couple of reasons, the Court declines to alter its ruling on the basis of *Heise*.  First, at the outset of its decision, the district court in *Heise* expressed skepticism that the outcome of the case turned on federal law.  Certainly, the decision did not involve any of the statutory provisions at issue here.  Instead, the decision depended on a construction of the language of the plan's documents.  *Id.* at 1145.  ("The court is not persuaded . . . that the Committee's calculation of Heise's benefits turns on a construction of Section 415 [of the Code]. This case concerns the way Heise's disability benefit has been calculated under the Plan. The calculation necessarily depends on an interpretation of the plan terms.").  As a result, the court's conclusions as to the meaning of terms such as "retirement benefit" are largely plan-specific and have no applicability in this case.  *See id.* at 1147 (listing five criteria for determining the reasonableness of the administrator's decision, four of which relate to the plan's terms and only one of which relates to ERISA's requirements).  Second, the court in *Heise* held only that the plan administrator's

F.3d at 544 (noting that even "payments [that] are not paid until retirement age" are disability payments if they are triggered by disability); Nondiscrimination Requirements for Qualified Plans, 56 Fed. Reg. 47,524, 47,531 (Sept. 19, 1991) (noting that a qualified disability benefit "can commence . . . at normal retirement age," and reaffirming that "[a] disability benefit that is not in excess of a qualified disability benefit is an ancillary benefit . . ."); *cf.* 26 C.F.R. § 1.411(d)-3(g)(2)(ii), (vi) (noting specifically that "[a] plant shutdown benefit" is an ancillary benefit if it "does not continue past retirement age," but applying no such duration requirement to "[a] benefit payable under a defined benefit plan in the event of disability").  Therefore, the Court sees no reason to depart from its conclusion that the IRD benefit is an ancillary benefit, and thus ineligible for protection under the anti-cutback rule.  Accordingly, Defendants are entitled to judgment on Count One of Plaintiffs' Amended Complaint.

## B.    Contractual Vesting

Even if ERISA's anti-cutback provision does not apply to the IRD benefits, the benefits may still be protected from reduction by contract if they have vested.  For "[n]othing in ERISA . . . forbids or prevents an employer from agreeing to vest employee welfare benefits or from waiving its ability to terminate or amend unilaterally a plan. . . ."  *Schonholz v. Long Island Jewish Med. Ctr.*, 87 F.3d 72, 77 (2d Cir. 1996).  In the Court's view, Plaintiffs' arguments for contractual vesting present a closer question than Plaintiffs' reliance on the anti-cutback provisions of ERISA.  Nonetheless, the

---

conclusion was reasonable, not that it was correct.  The court's decision rested on the substantial deference due the plan administrator. *See id.* at 1145 (noting that the administrator's decision would be reversed only if "extraordinary [sic] imprudent or extremely unreasonable" (internal quotation marks omitted)).  Here, the Plan administrators contend that the IRD benefit is an ancillary benefit.  Thus, the deference *Heise* showed plan administrators would favor Defendants in this case, not Plaintiffs.

Court concludes that the terms of the Plan documents gave the Trustees the right to amend the Plan and adopt the $35,000 earnings limitation for IRD benefits.

"Under ERISA it is the general rule that an employee welfare benefit plan is not vested and that an employer has the right to terminate or unilaterally to amend the plan at any time." *Id.* at 77. However, if the employer promises to vest certain rights, that promise will be enforced. Whether an employer has made such a promise is a "matter of contractual interpretation," to be resolved by the trier of fact, with any ambiguities construed against the plan's drafter. *Feifer v. Prudential Ins. Co. of Am.*, 306 F.3d 1202, 1211-12 (2d Cir. 2002). Thus, in the typical case in which the contractual vesting of welfare benefits is alleged, the trier of fact is called upon to determine whether there exists language in a plan document indicating that benefits have become vested. Because the employer retains a right unilaterally to amend or terminate welfare benefits in absence of such language, it is a plaintiff's burden to prove that such vesting language exists.[14]

It appears, however, that a different rule applies when the benefits at issue are disability

---

[14] The vast majority of Second Circuit decisions regarding the vesting of contractual rights have dealt with whether the lower court properly granted summary judgment. As a result, the decisions discuss the standard for deciding whether summary judgment was appropriate and not the standard a trier of fact (such as this Court in this case) should use to resolve finally a contractual vesting claim. *See, e.g.*, *Abbruscato v. Empire Blue Cross & Blue Shield*, 274 F.3d 90, 97 (2d Cir. 2001) ("In this Circuit, to avoid summary judgment on an ERISA contractual vesting claim, plaintiffs need only identify specific written language that is reasonably susceptible to interpretation as a promise." (internal quotation marks omitted)); *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 84 (2d Cir. 2001) ("[A] plaintiff need only point to written language capable of reasonably being interpreted as creating a promise to survive an employer's summary judgment motion." (internal quotation marks omitted)); *Schonholz*, 87 F.3d at 78 (remanding a contractual vesting claim because plaintiff could identify "written language capable of reasonably being interpreted as creating a promise . . . to vest"). Apart from noting that the issue is a "matter of contractual interpretation" and that ambiguities should be construed against the document's drafter, the Second Circuit has done little to flesh out the standards that a trier of fact should apply in resolving a contractual vesting claim.

benefits. *Gibbs v. CIGNA Corp.*, 440 F.3d 571, 576 (2d Cir. 2006) ("Disability plans are treated somewhat differently than other welfare plans for purposes of vesting."). For the Second Circuit has held that "*absent explicit language to the contrary*, a plan document providing for disability benefits promises that these benefits vest with respect to an employee no later than the time that the employee becomes disabled." *Feifer*, 306 F.3d at 1212 (emphasis added). As a result, an employer opposing a contractual vesting argument in the context of a disability plan bears the burden of identifying "explicit language reserving [the employer's] right to terminate or alter a disabled employee's benefits." *Gibbs*, 440 F.3d at 577 (internal quotation marks omitted).

Defendants cite several cases for the proposition that vesting may occur only "when the employer promises the employee a lifetime welfare benefit through specific, written language contained in a formal plan document." Defs.' Pre-Trial Opening Brief [doc. # 69] at 37 (citing cases). But the cases Defendants cite are easily distinguishable, as they do not deal with disability benefits. *See, e.g.*, *Abbruscato v. Empire Blue Cross & Blue Shield*, 274 F.3d 90, 97 (2d Cir. 2001) (discussing whether life insurance benefits had vested); *Am. Fed'n of Grain Millers v. Int'l Multifoods Corp.*, 116 F.3d 976, 982 (2d Cir. 1997) (discussing retirement benefits). *Feifer* establishes that a different standard applies to disability benefits than to other types of benefits, and that vesting of the disability benefits occurs upon disability "absent explicit language to the contrary." 306 F.3d at 1212.

Exactly what constitutes "explicit language" sufficient to prevent contractual vesting of disability benefits is not entirely clear, however. Is language explicitly reserving the employer's right to amend the plan at any time sufficient, or must an employer do more than merely reserve the right to amend the plan? For example, must the employer also explicitly reserve the right to reduce disability benefits after the employee has become disabled? One could certainly argue that, as a

matter of policy, requiring the employer to expressly reserve the right to reduce disability benefits to a disabled employee would force employers to articulate their right to amend disability benefits in a manner that leaves no possibility of confusion. On the other hand, if employers were compelled to spell out their power to alter or amend every aspect of every disability plan merely to avoid a vesting argument, plan documents, including SPDs, would become even more lengthy and unwieldy than they currently are. Such a requirement would be particularly inefficient in the case of SPDs. The Court has not been directed to any decision that, in the context of contractual vesting, has required an employer explicitly to reserve the right to reduce disability benefits after the employee has become disabled. In absence of clear guidance from the Second Circuit, the Court declines to impose such a requirement and holds instead that an employer can satisfy the Second Circuit's "explicit language to the contrary" standard with language in the plan that expressly makes clear the employer's unrestricted power to change the plan at any time.

Decisions involving claims that disability benefits have contractually vested are infrequent. *Feifer* itself did not discuss whether the plan at issue contained explicit language negating vesting. In *Gibbs v. CIGNA Corp.*, the Second Circuit recently found an absence of explicit language preventing the vesting of disability rights, and indeed found specific evidence to the contrary: "[T]he 1995 SPD states [that] . . . 'Any modification or termination will not affect your right to benefits from a covered *disability that occurred before* the termination or modification' (emphasis added)." 440 F.3d 571, 577 (2d Cir. 2006). By contrast, in *Hartranft v. Hartford Life and Acc. Ins. Co.*, No. 3:01CV1870 (JBA), 2004 WL 2377228 (D. Conn. Sept. 30, 2004), Judge Janet Bond Arterton of this court held that an SPD informed employees unambiguously that the employer was "authorized to change the terms of coverage even after an employee has become disabled, because the provision

clearly states that [the employer] may change the plan 'at any time,' and that '[the employer] does not promise the continuation of any health benefits.'" *Id.* at *6.

This case is far closer to *Hartranft* than to *Gibbs*. Several provisions in the Plan and SPDs serve as explicit anti-vesting language. For one, a section of the Plan entitled "Eligibility for an Industry-Related Disability Pension" states that "any . . . terms as deemed necessary by the Trustees may be required as a prerequisite to the granting *or continuance* of an Industry-Related Disability Pension." Ex. 35 at 3270-71 (emphasis added). This provision would make no sense if the Trustees were forbidden from changing the prerequisites for receipt of an IRD benefit after the beneficiary became disabled, since all beneficiaries of IRD benefits are already disabled at the time they start receiving those benefits. In other words, since Plan participants can only qualify for the IRD benefit if they are already disabled, any change in a "prerequisite to the . . . continuance" of an IRD benefit will necessarily take place after the disability occurs.

The Plan also explicitly describes the Trustees' power to amend the Plan at any time. In a section titled "AMENDMENT, TERMINATION AND GENERAL PROVISIONS," the 1994 Plan provides: "This Plan may be amended at any time by the Trustees, consistent with the provisions of the Trust Agreement." Ex. 35 at 3324; *see also* Ex. 9 at 1082 (same provision in 1999 Plan). Although in its discussion of vested status – in language tracking ERISA's anti-cutback provision and the Senate Report – the Plan expressly forbids amendments that have "the effect of . . . eliminating or reducing an early retirement benefit or a retirement-type subsidy," the Plan specifically excludes from this protection "a qualified disability benefit (within the meaning of Section 411 (a) (9) of the Code)," Ex. 35 at 3295, a term that encompasses the IRD benefit at issue in this case.

The Plan's SPDs similarly and explicitly reserve the Trustees' right to amend the Plan at any

time. *See, e.g.*, Ex. 23 at 2900 (1997 SPD) ("The Trustees are empowered to amend the Plan at any time in accordance with the law and for such purposes as the Trustees deem appropriate. The Trustees are further empowered to terminate the Plan."); Ex. 25 at 3024 (2002 SPD) ("The Board of Trustees reserves the right to terminate, modify, suspend or amend the Pension Plan at any time, in whole or in part, under circumstances allowed by ERISA and the terms of the governing Trust Agreement. The Board will make such changes to the Plan by Plan Amendment."). Indeed, the 1997 SPD noted in its introduction that a beneficiary terminating his employment before January 1, 1994, would receive benefits "determined in accordance with the provisions of the Plan in effect on the date his employment terminated, *except to the extent otherwise specifically provided under subsequent Plan amendments or restatements*." Ex. 23 at 2866 (emphasis added).

In response, Plaintiffs insist that language in the Plan, which indicated that the IRD benefit would be paid for life, promised that those benefits would not be changed. For instance, Plaintiffs point to a section titled "Benefit Payments Generally," which states: "A Participant who is eligible to receive benefits under this Plan and who makes application in accordance with the rules of this Plan, shall be entitled upon retirement to receive the monthly benefits provided for the remainder of his life, subject to the provisions of this Plan." Ex. 35 at 3288. Plaintiffs also note that the IRD benefit was to be paid as a "Husband-and-Wife Pension," which the Plan described as "provid[ing] a lifetime pension for a married Participant plus a lifetime pension for his or her surviving spouse, starting after the death of the Participant." Ex. 35 at 3274; *see also* Ex. 18 at 2436 (2002 Plan) (allowing benefits to be provided as Husband-and-Wife Pension or "Lifetime Pension," which "provides a pension for the life of the Participant and ceases with the Participant's death"). Plaintiffs

35

maintain that the Plan's use of "lifetime" language vested Plaintiffs' right to IRD benefits.[15]   To

support their argument, Plaintiffs also cite to *Devlin*, 274 F.3d 76, in which the Second Circuit found

ambiguity as to whether an employer had explicitly promised to vest life insurance benefits where the

SPD contained language referring to "lifetime" benefits.  *Id.* at 84-85.

  *Devlin* is inapposite, however, because the plan documents that allegedly vested benefits in

that case did not contain language stating that the employer retained the right to amend the plans.  *See*

*id.*   More relevant is *Abbruscato*, 274 F.3d 90, which involved a plan document that included

"lifetime" language but also contained language allowing the employer to amend or terminate benefits

"at any time."   In *Abbruscato*, the Second Circuit held that "[b]ecause the same document that

potentially provided the 'lifetime' benefits also clearly informed employees that these benefits were

subject to modification, we conclude that the language contained in the 1987 SPD is not susceptible

to an interpretation that promises vested lifetime life insurance benefits."  *Id.* at 99; *see also Sprague*

*v. Gen. Motors Corp.*, 133 F.3d 388, 401 (6th Cir. 1998) (en banc) ("We see no ambiguity in a

---

  [15] Plaintiffs also cite to documents other than the Plan and SPDs – sometimes described as "non-plan documents" – that also use "lifetime" language.  *See, e.g.*, Ex. 28 at 3081 (IRD benefit application form stating, above the signature line, "I will receive the monthly benefit payment listed for my lifetime."); *see also* Ex. 1 at 56-57 (Husband and Wife Pension Rejection Form).  In *Moore v. Metro. Life Ins. Co.*, 856 F.2d 488 (2d Cir. 1988), the Second Circuit explicitly rejected a claim that non-plan documents had created vested rights.  *Moore* held that "absent a showing tantamount to proof of fraud, an ERISA welfare plan is not subject to amendment as a result of informal communications between an employer and plan beneficiaries."  *Id.* at 492.  However, in a footnote in *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76 (2d Cir. 2001), the Second Circuit briefly noted "exit letters given to retiring employees," which had indicated that an insurance benefit "w[ould] remain constant for life." *Id.* at 85 n.7.  *Devlin* stated that the "letters included no indication that this coverage would be reduced or terminated.  Such evidence arguably reinforces plaintiffs' interpretation of the relevant plan documents."  *Id.*  Here, this Court need not decide whether it may consider the non-plan documents Plaintiffs cite, because the documents do not contain language appreciably different from the "lifetime" language contained in the Plan itself.  Therefore, the non-Plan documents would not alter the Court's conclusions in any respect.

summary plan description that tells participants both that the terms of the current plan entitle them to health insurance at no cost throughout retirement and that the terms of the current plan are subject to change.").  Though *Abbruscato* dealt with a life insurance benefit – and therefore the burden was on plaintiffs to show explicit vesting language, whereas here the burden is on the employer to point to language explicitly negating vesting – the conclusion reached in *Abbruscato*, that "lifetime" language does not render an explicit right-to-amend clause ambiguous, is equally applicable in this case.  *But cf. Moore*, 856 F.2d at 493 (noting that "the use of language such as 'lifetime' . . . might conceivably create a triable issue of fact on a contract theory," notwithstanding plan language allowing the employer to amend or revoke benefits at any time, although deciding the case on other grounds).

*Abbruscato* also considered other plan documents (so-called VIP and VSOP documents) that used "lifetime" language and also contained right-to-amend clauses.  The court held that the VIP and VSOP documents were ambiguous, making summary judgment on plaintiffs' contractual vesting claims inappropriate.  *Abbruscato*, 274 F.3d at 98.  However, as the court noted, "neither the VSOP nor the VIP contain[ed] unambiguous reservation of rights clauses. . . ."  *Id.*  The VSOP document provided that the employer "reserves the right to amend and/or terminate the VSO *Program* at any time for any purpose."  *Id.* at 97 (emphasis in original).  The Second Circuit held that this provision "is capable of being interpreted to mean that [the employer] merely reserved the right to change the *program* for those individuals who have not already retired under the terms described, not the right to alter the described benefits for those individuals who had retired under those terms."  *Id.* at 98 (emphasis in original).  The VIP document stated that the employer "reserves the right to amend and/or withdraw the VIP at any time for any purpose with respect to any employee, *up to the date on*

*which that employee's Resignation and General Release and Covenant Not to Sue* becomes effective." *Id.* (emphasis in original).  As the Second Circuit explained, this right-to-amend provision had expired "by its own terms." *Id.*

By contrast to the VSOP document in *Abbruscato*, the Plan document in this case explicitly reserves the Trustees' right to amend the entire Plan (not just the program) and to impose "any . . . terms as deemed necessary" for receipt of IRD benefits.  Furthermore, the Plan expressly exempts disability benefits from its anti-amendment protections.  And unlike the VIP document, the Plan does not impose any durational limitations on the Trustees' power to amend.  Indeed, the Plan's general right-to-amend clause, which states that "[t]his Plan may be amended at any time by the Trustees" is materially similar to the *Abbruscato* SPD's right-to-amend clause, which, the court held, unambiguously stated that the "company . . . reserves its right to amend each of the Plans at any time." *Id.*

In sum, notwithstanding the Plan's references to  "lifetime" benefits,  the Court concludes – in accordance with *Abbruscato* –  that the Plan contained explicit anti-vesting language because the Plan documents unambiguously reserved the Trustees' authority to amend or alter the IRD benefits at any time.   In fact, the present case is even clearer than *Abbruscato*, because the Plan's statement that the IRD benefit would be paid "for the remainder of [a beneficiary's] life" was explicitly made "subject to the provisions of this Plan," which include the right-to-amend provisions.  The Plan also informed beneficiaries that the Trustees retained the power to impose "any" additional restrictions on the IRD benefit "as deemed necessary," and committed eligibility determinations to their "sole and absolute discretion."  And while "[a]nnual pension benefit[s] . . . commencing at Normal Retirement Age" were explicitly exempted from the right-to-amend clause, the IRD benefit was not. To the

contrary, the Plan's discussion of vested status provided that "a qualified disability benefit" merited no protection, lending strong support for the conclusion that Plan participants were forewarned that the IRD benefit itself was subject to change.

Language indicating that the IRD benefit would be paid for the beneficiary's life was thus merely a factually correct statement of the benefits then provided by the Plan – benefits that were expressly subject to amendment "at any time." *See Abbruscato*, 274 F.3d at 100 ("'[T]he promise made to retirees was a qualified one: the promise was that retiree medical benefits were for life provided the company chose not to terminate the plans, pursuant to clauses that preserved the company's right to terminate the plan under which those benefits are provided.'" (quoting *In re Unisys Corp. Retiree Med. Benefit ERISA Litig.*, 58 F.3d 896, 904 n.12 (3d Cir.1995))). Even after imposition of the earnings limitation, it remains true that an IRD beneficiary will receive his benefits "for the remainder of [his] life" – so long as he continues to qualifies for them (the earnings limitation being merely another eligibility criterion). *See* Ex. 35 at 3270-71 (expressly giving the Trustees the authority to determine the prerequisites to "the granting *or continuance* of an Industry-Related Disability Pension") (emphasis added).[16] Therefore, just as the Second Circuit in *Abbruscato* found the combination of "lifetime" language and a right-to-amend clause to be unambiguous, so this Court concludes that the Plan contained explicit language sufficient to prevent contractual vesting of IRD benefits.

Both sides have argued that recourse to non-record evidence is unnecessary on the question of contractual vesting; in fact, neither has suggested that any non-record evidence bearing on vesting

---

[16] Indeed, because IRD benefits would continue only so long as the beneficiary remains disabled, it is clear from the Plan itself that IRD benefits are not "lifetime" benefits in the sense that they continue without change for the beneficiary's entire life, no matter what happens.

even exists.  The Court agrees. The Plan and SPDs are clear and unambiguous, making extrinsic evidence (even if any existed) neither necessary nor admissible.  *See Feifer*, 306 F.3d at 1210-11.  As recited above, on the basis of the evidence in the record, Defendants are entitled to judgment on Count Two of Plaintiffs' Amended Complaint**.**

**C.     Promissory Estoppel**

Promissory estoppel principles are applied in the ERISA context.  To make out an estoppel claim under ERISA, a plaintiff must show "(1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, and (4) an injustice if the promise is not enforced." *Schonholz v. Long Island Jewish Med. Center*, 87 F.3d 72, 79 (2d Cir. 1996).  In addition, the plaintiff must demonstrate "extraordinary circumstances." *Aramony v. United Way Replacement Benefit Plan*, 191 F.3d 140, 151-52 (2d Cir. 1999).  The Second Circuit has explained that the extraordinary circumstances requirement exists "[i]n order to lessen the danger that commonplace communications from employer to employee will routinely be claimed to give rise to employees' rights beyond those contained in formal benefit plans. . . ." *Id.* at 151.

To show that Defendants promised not to alter the IRD benefit, Plaintiffs point to precisely the same evidence they marshaled in support of their contractual vesting claim: Plan provisions indicating that payments would be made "for life."  The Court has already found that these statements, when read in conjunction with other provisions expressly reserving the Trustees' right to amend the Plan, did not constitute a contractual promise that benefits would never be reduced.  *A fortiori*, then, these same provisions cannot satisfy the first element of Plaintiffs' promissory estoppel claim.

Even if the Court were to find that Plaintiffs had satisfied the "promise" element of the cause of action, Plaintiffs cannot demonstrate the requisite "extraordinary circumstances."  Typically, courts

have found extraordinary circumstances to exist where plan administrators have used a promise about benefits to induce employees to retire. *See, e.g.*, *Schonholz*, 87 F.3d at 79 ("If [the employer] had not transmitted the December 18 letter [promising certain benefits], Schonholz might never have submitted her resignation."); *DePace v. Matsushita Elec. Corp. of Am.*, 257 F. Supp. 2d 543 (E.D.N.Y. 2003) (finding that plaintiffs had made out a valid estoppel claim where their employer made statements about benefits to induce participation in a voluntary retirement program); *see also Devlin*, 274 F.3d at 86 ("*Schonholz* provides an example of . . . extraordinary circumstances, where the employer used promised severance benefits to induce the plaintiff to retire."). By contrast, where there was no evidence that an employer made a promise for the purpose of inducing action, courts have not found "extraordinary circumstances." *See, e.g.*, *Aramony*, 191 F.3d at 152-53 (stating that a "combination of [a plan's] ambiguity – which we have concluded does not alone suffice to establish extraordinary circumstances – and the promise element of ordinary estoppel analysis does not" establish promissory estoppel); *Devlin v. Transp. Commc'ns Int'l Union*, 173 F.3d 94, 102 (2d Cir. 1999) ("Admittedly, there is evidence in this record to support the notion that some employees . . . considered the promised medical benefits in timing their retirements. But reliance . . . would not by itself render this case 'extraordinary.'"); *id.* ("In the instant case . . . there is no evidence to suggest that appellees sought the retirement of any of the appellants, or that the promise of free, lifetime health benefits was used to intentionally induce any particular behavior on appellants' part.").

Plaintiffs offer no evidence – and indeed make no allegations – that Defendants made the "lifetime" statements in the Plan in order to induce Plaintiffs to choose to receive benefits under the IRD plan. Nor could they, since the same "lifetime" statements made in relation to the IRD benefit apply equally to other Plan benefits such as the Early Retirement Pension. Instead, Plaintiffs argue

that other factors besides inducement might give rise to "extraordinary circumstances," citing suggestive language from several Second Circuit decisions. *See Aramony*, 191 F.3d at 152 n.5 (noting that "the alleged promise in *Devlin* was not an intentional inducement of any kind, *nor was it in any other way "extraordinary"* (emphasis added)); *see also Devlin*, 274 F.3d at 86 (declining to decide "whether extraordinary circumstances other than intentional inducement would suffice"). Even if proving intentional inducement were not the only way to establish extraordinary circumstances, however, Plaintiffs have offered no evidence of any additional circumstances – extraordinary or otherwise – beyond the basic elements of an ordinary promissory estoppel claim.[17]  *Cf. Arnold v. Lucks*, 392 F.3d 512, 520 (2d Cir. 2004) (noting that defendants conceded that circumstances were extraordinary because defendants had initiated an arbitration in 1981 demanding additional contributions from plaintiff's employer on plaintiff's behalf; had won the arbitration and received the additional contributions from plaintiff's employer; and then, seventeen years later, told plaintiff that he was not eligible to participate in the plan and that his health and pension coverage would be terminated).  Therefore, Defendants are entitled to judgment on Count Three of Plaintiff's Amended Complaint.

**D.      Breach of Fiduciary Duty**

ERISA creates certain fiduciary duties on the part of plan trustees and administrators. *Wilkins*

---

[17]  At oral argument, counsel for Plaintiffs suggested that Defendants intentionally induced employees to continue working in the sheet metal industry with the promise of lifetime benefits in the event of disability. But to accept Plaintiffs' argument would render the "extraordinary circumstances" requirement meaningless, since *all* employees rely upon the benefits their employer offers when choosing to continue working for the employer. In any event, even if such circumstances would qualify as extraordinary for purposes of an ERISA promissory estoppel claim, Plaintiffs have presented no evidence that would permit the Court to make such a finding or even to surmise  that any such evidence potentially exists.

*v. Mason Tenders Dist. Council Pension Fund*, 445 F.3d 572, 579 (2d Cir. 2006). Plaintiffs allege that Defendants violated these duties by failing to communicate material facts about the IRD benefits and to provide adequate SPDs. Specifically, Plaintiffs assert that Defendants failed to communicate adequately the fact that the IRD benefit might be altered after beneficiaries became disabled, and that Defendants' SPDs did not sufficiently warn participants about the possibility.

### 1.    Failure to Communicate Material Facts

"'[W]hen a plan administrator affirmatively misrepresents the terms of a plan or fails to provide information when it knows that its failure to do so might cause harm, the plan administrator has breached its fiduciary duty to individual plan participants and beneficiaries.'" *Devlin*, 274 F.3d at 88 (alteration in original) (quoting *In re Unisys*, 57 F.3d at 1264). "To establish a claim for breach of fiduciary duty based on alleged misrepresentations concerning coverage under an employee benefit plan, plaintiffs must show: (1) that the defendant was acting in a fiduciary capacity when it made the challenged representations; (2) that these constituted material misrepresentations; and (3) that plaintiffs relied on those misrepresentation [sic] to their detriment." *McMunn v. Pirelli Tire, LLC*, 161 F. Supp. 2d 97, 120 (D. Conn. 2001). Determining whether a false statement was material is ordinarily a fact-specific inquiry, turning on such factors as: "how significantly the statement misrepresents the present status of internal deliberations regarding future plan changes; the special relationship of trust and confidence between the plan fiduciary and beneficiary; whether the employee was aware of other information or statements from the company tending to minimize the importance of the misrepresentation or should have been so aware, taking into consideration the broad trust responsibilities owed by the plan administrator to the employee and the employee's reliance on the plan administrator for truthful information; and the specificity of the assurance." *Ballone v. Eastman*

*Kodak Co.*, 109 F.3d 117, 125 (2d Cir. 1997) (internal citations omitted).

As explained above, in the Court's view neither the Plan nor the SPDs contained material misstatements. The Plan explicitly informed beneficiaries that payments under the IRD benefit were "subject to the provisions of [the] Plan"; that the Trustees were empowered to impose "any" additional restrictions on the IRD benefit that they "deemed necessary"; and that the IRD benefit could be amended by the Trustees "at any time." The SPDs similarly emphasized the Trustees' right to amend the Plan at any time. *See, e.g.*, Ex. 23 at 2900 (1997 SPD); Ex. 25 at 3024 (2002 SPD).

In support of their claim, Plaintiffs emphasize certain non-plan documents – the IRD benefit application forms and the Husband and Wife Pension Rejection Forms, both of which use "lifetime" language and neither of which mentions the right-to-amend clause. *See, e.g.*, Ex. 1 at 56-57 (showing that the Husband and Wife Pension Rejection Form cautions: "I understand that rejecting this form of pension means lifetime benefits will not be paid to my spouse"); Ex. 28 at 3081 (showing that the IRD benefit application form has printed, above the signature line, "I will receive the monthly benefit payment listed for my lifetime"). However, taking account of all the circumstances, the Court concludes for several reasons that these non-plan documents by themselves do not establish a material misrepresentation by Defendants.

First, as noted above, the "lifetime" language those documents use was a factually correct statement of the benefits then existing under the Plan, benefits that were subject to amendment and additional eligibility criteria. *See Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 405 (6th Cir. 1998) ("GM never told the early retirees that their health care benefits would be fully paid up or vested upon retirement. What GM told many of them, rather, was that their coverage was to be paid by GM for their lifetimes. This was undeniably true under the terms of GM's then-existing plan."). Second,

44

these non-plan documents were relatively cursory in nature  – in the case of the Husband and Wife

Pension Rejection Form, only a few pages – and did not purport to set out the full terms of the Plan.

The Court does not believe that any reasonable beneficiary would have looked at these forms and

assumed that they spelled out the full terms and conditions of the IRD benefit.   Third, beneficiaries

were repeatedly informed, through successive versions of the Plan and SPDs, that IRD benefits might

be amended.  *See McMunn*, 161 F. Supp. 2d at 124 ("Where . . . clear reservations of rights are used

consistently in the plan documents, employees reasonably should have been aware that their retiree

benefits were subject to change . . . .").   Consequently, the Court concludes that, even if the language

from these non-plan documents could be construed as incomplete (a conclusion that the Court does

not endorse), they do not constitute material misstatements under these circumstances.

Plaintiffs argue that this case is analogous to *In re Unisys Corp. Retiree Medical Benefit*

*"ERISA" Litigation*, 57 F.3d 1255 (3d Cir. 1995), in which an employer, in plan language and in oral

communications with its employees, stated that benefits would continue "for life," despite a right-to-

amend clause in the plan and SPDs.  *Id.* at 1259.   The Third Circuit held that the beneficiaries could

pursue their breach of a fiduciary duty claim:

> [T]his is not a case involving an employer's "duty to remind."  Instead, this case is
> more accurately characterized as a dispute over an employer's duty, as an ERISA
> fiduciary, not to misinform employees through material misrepresentations and
> incomplete, inconsistent or contradictory disclosures. . . . Here the district court found
> that [the plan sponsor] affirmatively and systematically represented to its employees
> that once they retired, their medical benefits would continue for life – even though as
> the district court concluded in rejecting the retirees' contract claim, the plans clearly
> permitted the company to terminate benefits.

*Id.* at 1264.  However, in reaching its conclusion, the Third Circuit emphasized that the employer's

misleading communications to beneficiaries were widespread and systematic.  As the court put it,

"Here the district court found that virtually the entire company management had consistently misrepresented the plan, not just on one occasion or to one employee, but over a period of many years and both orally (in group meetings) and in writing (in newsletters) as well." *Id.* at 1265.  Thus, *In re Unisys* was "not a case where one or two low level benefits counselors told a few retirees that their benefits would continue for life. The message that medical benefits would last for life was confirmed repeatedly and systematically throughout the . . . organization, by all levels of management, in writing and verbally." *Id.* at 1260.  Moreover, the company knew that "its employees believed the assurances of lifetime benefits they had been given and were making retirement decisions based on their understanding that when they retired, the benefits that they had at the time they retired would continue for life." *Id.* at 1266.

The repeated, systematic misrepresentations in *In re Unisys* were far more extreme than those alleged in the present case.  There is no evidence that Plaintiffs ever asked Defendants about whether benefits might later be altered, or that Defendants gave misleading responses to such questions.  *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., U.A.W. v. Skinner Engine Co.*, 188 F.3d 130, 150 (3d Cir. 1999) ("[T]here is no evidence that suggests that the company stood silent and failed to properly advise employees when specifically asked about the duration of retiree benefits."); *McMunn*, 161 F. Supp. 2d at 122 & n.117 ("[O]ther circuits have focused on whether the employer misled employees when specifically asked about the duration of retiree benefits, or made promises that retiree medical benefits could not be changed in the future, despite the fact that the Plans at issue did not provide for vested benefits.") (citing cases).  Nor is there is any indication that Defendants knew that Plan beneficiaries were selecting the IRD benefit under the mistaken assumption that its benefits were vested.  *Cf. McMunn*, 161 F. Supp. 2d at 124 ("[W]here a company

46

has deliberately fostered the belief that retirement benefits are lifetime benefits, and is aware that its

employees incorrectly–if understandably–believe that their medical benefits will continue unchanged

for the duration of their retirement, . . . a reservation of rights in an SPD does not insulate the

company from its obligation to provide 'complete and accurate information.'").  Therefore, the Court

does not find a breach of fiduciary duty in Defendants' failure to "tell the [beneficiaries] at every

possible opportunity that which it had told them many times before – namely, that the terms of the

plan were subject to change."  *Sprague*, 133 F.3d at 405; *see also Adams v. Tetley USA, Inc.*, 363 F.

Supp. 2d 94, 108-09 (D. Conn. 2005) (holding that while an employer's executives promised

"lifetime" benefits to plaintiff in response to a question during a meeting, plaintiff "could not

reasonably have relied on this misrepresentation, because the next year he signed a written severance

agreement that contained no 'lifetime' promise, and a benefits summary that contained an explicit

reservation of [the employer]'s right to terminate the retiree medical plan").

###### 2.   Failure to Provide an Adequate SPD

An SPD must be

> written in a manner calculated to be understood by the average plan participant and
> must be sufficiently accurate and comprehensive to apprise such participants and
> beneficiaries of their rights and obligations under the plan.  ERISA contemplates that
> the summary [plan description] will be an employee's primary source of information
> regarding employment benefits, and employees are entitled to rely on the descriptions
> contained in the summary.

*Layaou v. Xerox Corp.*, 238 F.3d 205, 209 (2d Cir. 2001) (internal quotation marks and citation

omitted) (alteration in original).  "The format of the summary plan description must not have the

effect to misleading, misinforming or failing to inform participants and beneficiaries."  29 C.F.R.

§ 2520.102-2(b).  "In assessing the adequacy of an SPD, [the Court] consider[s] the document as a

whole." *Estate of Becker v. Eastman Kodak Co.*, 120 F.3d 5, 8 (2d Cir. 1997).

Plaintiffs essentially make the same arguments in support of their argument regarding the inadequacy of the SPDs as they made in their contractual-vesting, promissory-estoppel, and failure-to-communicate claims. Plaintiffs argue that Defendants' SPDs were misleading because they:

> 1) misrepresent[ed] the IRD Pension as a *pension* and/or lifetime benefit that, like all other pension benefits under the plan, accrues and/or vests upon disability; and 2) d[id] not communicate that the IRD Pension benefit may be lost for reasons other than those that are specified such as recovery from disability – *i.e.*, that defendants might treat the IRD Pension as a welfare and/or ancillary benefit that can be reduced and/or terminated at any time – or emphasize the importance of the reservation of rights clause with respect to the IRD Pension since the Plan represents that it is a pension and/or lifetime benefit like all other pension benefits under the plan.

Pls.' Trial Mem. [doc. #71] at 61.

In support of these arguments, Plaintiffs point to the same SPD language they highlighted in support of their other claims. And as with those claims, Plaintiffs are unable to point to a single factually incorrect statement made by Defendants. Indeed, the evidence for this claim is in many ways weaker than for Plaintiffs' other claims, because the SPD (unlike the IRD benefit application forms and the Husband and Wife Pension Rejection Forms) explicitly contained a right-to-amend clause:

> The Trustees are empowered to amend the Plan at any time in accordance with the law and for such purposes as the Trustees deem appropriate. The Trustees are further empowered to terminate the Plan.

Ex. 23 at 2900 (1997 SPD); *see* Ex. 25 at 3024 (2002 SPD) ("The Board of Trustees reserves the right to terminate, modify, suspend or amend the Pension Plan at any time, in whole or in part, under circumstances allowed by ERISA and the terms of the governing Trust Agreement. The Board will make such changes to the Plan by Plan Amendment."). The introduction to the 1997 SPD also

noted – on the very first page of the document – that a beneficiary who terminated his employment before January 1, 1994, would receive benefits "determined in accordance with the provisions of the Plan in effect on the date his employment terminated, *except to the extent otherwise specifically provided under subsequent Plan amendments or restatements*."  Ex. 23 at 2866 (emphasis added).  Beneficiaries were thus put on notice that benefits to which they were entitled under the Plan might be altered by later amendments.  Furthermore, none of the SPDs stated that the IRD plan allowed employment outside the sheet-metal industry without an earnings limitation.

Plaintiffs' strongest evidence that the SPDs inadequately warned employees of future amendments is found in the discussion of "Vested Status" in the 1997 SPD.  That document explains: "You achieve Vested Status when you earn the right to a pension.  Once you attain Vested Status you will not lose your right to a pension from the Plan if you stop working in the Sheet Metal Industry." Ex. 23 at 2872.  The section goes on to list the years of service a beneficiary must perform before achieving vested status.  Earlier in the SPD, in the "Terms Used in Describing Your Pension Plan" section, the document defines "Vested Benefit" as "A benefit under the Plan to which a Participant has a nonforfeitable right."  Ex. 23 at 2868.

Though the term "vested" may not have been ideal, the Court concludes that the 1997 SPD's discussion of Vested Status does not make it misleading.  The SPD makes clear that the import of Vested Status is to prevent beneficiaries from "los[ing] [their] right to a pension from the Plan if [they] stop working in the Sheet Metal Industry." Ex. 23 at 2872.  Vested Status does not mean that once a beneficiary becomes entitled to a disability pension, disability benefits are insulated from future changes.  Read in context, particularly in conjunction with the right-to-amend clause, as well as the introduction, the Court does not believe that the Vested Status discussion in the 1997 SPD

49

misleadingly implied to beneficiaries that their IRD benefits could never be altered.  In sum, construing each SPD as a whole, the Court concludes that they are adequate, and consequently finds that Defendants did not breach their fiduciary duties as Plaintiffs allege.  Therefore, Defendants are entitled to judgment on Count Four of Plaintiffs' Amended Complaint.

**E.    Mootness**

Finally, Defendants argue that the claims of Mr. Donohue and all other IRD benefit recipients over the age of 55 are moot.  In view of the Court's ruling that Defendants are not liable to Plaintiffs under any of Plaintiffs' claims, the Court need not (and does not) reach Defendants' argument.


**III**

For the foregoing reasons, the Court concludes that, in adopting the 2004 amendments, Defendants (1) did not violate ERISA's anti-cutback protections; (2) did not violate contractually-vested rights; (3) did not reduce rights that Plaintiffs had been promised; and (4) did not breach Defendants' fiduciary duties.  The Court thus finds for Defendants on each of Plaintiffs' claims.  **The Clerk is directed to enter judgment for Defendants on all of Plaintiffs' claims and to close the file.**

IT IS SO ORDERED,


/s/ _____Mark R. Kravitz_____
United States District Judge


**Dated at New Haven, Connecticut: July 27, 2006.**

50